UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>Shawn D. Markel,<br><br>              Debtor.<br>_____/<br>Shawn D. Markel,<br><br>              Plaintiff,<br><br>  vs.<br><br>Bank of North Dakota, Educational<br>Assets Corporation, and the United<br>States Department of Education,<br><br>              Defendants.<br>_____/ | Bankruptcy No. 05-30470<br>Chapter 7<br><br><br><br>Adversary No. 05-07027 |

**MEMORANDUM AND ORDER**

By Complaint filed June 13, 2005, Plaintiff Shawn D. Markel initiated this adversary proceeding seeking a determination that he is entitled to an undue hardship discharge of his student loan debt totaling $14,923.46 pursuant to 11 U.S.C. § 523(a)(8). The United States Department of Education ("DOE") filed its Answer on August 12, 2005, requesting a determination that Debtor's student loans be ruled nondischargeable. The matter was tried on November 30, 2005. The following constitutes the Court's findings of fact and conclusions of law.

**Findings of Fact**

Markel is a 33-year-old, single, healthy man with no dependents. He currently lives alone in an apartment in Mandan, North Dakota. After graduating from high school as what he termed an "average student," Markel began attending the University of North Dakota in Grand

Forks, North Dakota, in 1990.  While attending UND, Markel was also in the Army National Guard with a bridge building unit.  Markel's original area of study was Computer Science, but after failing a computer programming course he switched his major to Business Administration during his second year.  Although Markel performed well in his business classes, his overall grade point average of 2.4 was not high enough to continue pursuing a Business Administration degree. Markel retook the computer programming class he failed in an attempt to raise his overall GPA, but he failed the course a second time.  In the summer of 1993, after three years at UND, Markel left school and returned to Mandan to begin working part-time.

After returning to Mandan, Markel enrolled in the University of Mary in Bismarck, North Dakota,[1] and continued pursuing a Business Administration degree.  During this time, Markel also continued service in the Army National Guard.   While attending the University of Mary, there was confusion regarding the status of Markel's student loans and he defaulted.  Unable to obtain another student loan, and having no other way to pay for school, Markel left the university to work full-time in an attempt to earn enough money to repay his student loans.  Although he testified he was doing all right in his classes at the University of Mary, Markel did not earn enough money working to make payments on his student loans and he never returned to school. When he left the University of Mary, Markel was approximately one year away from obtaining a degree in Business Administration.  Markel's last year of school was either 1996 or 1997. Markel left the National Guard in 1999 at the rank of E-5, Sergeant.

After leaving school, Markel obtained various positions at businesses in Bismarck.  He

---

[1] Bismarck, North Dakota, and Mandan, North Dakota, are neighboring cities separated by the Missouri river.  Although separate cities, the Court will hereafter use Bismarck to refer to the Bismarck/Mandan area.

worked as a customer service representative dealing with computer software related inquiries, but was laid off after his employer lost a major account. Markel then worked for Radio Shack as a sales representative where he earned minimum wage and received a 2% commission on all sales. He testified he was earning approximately $250 per week while at Radio Shack. Markel then worked for Dunbar Armored as a security guard. In this position, Markel was licensed by the State of North Dakota to carry a weapon, but he has since let the license lapse. Markel was earning $7.50 an hour when he left Dunbar.

Since 2000, Markel has been working lawn maintenance for MJM Grounds Maintenance ("MJM").[2] At MJM, Markel is a licensed pesticide sprayer and performs other tasks such as fertilization and aeration. He is paid $10.00 an hour and works approximately eight months out of the year. Markel's father is the owner of MJM, and when Markel first started at MJM he received the use of a Chevrolet Silverado as a benefit. Markel testified the vehicle is his father's so he does not make payments on it, but he is allowed to drive it as long as he pays for gas and insurance. Markel estimated that insurance costs him $100 per month and gas costs another $120 per month. Markel further testified that he expects to receive only cost-of-living increases in his salary at MJM. In 2005, Markel worked for MJM from April through October. He earned approximately $12,800 working for MJM in 2005.

During the months when he is not working for MJM, Markel is a security guard for Bismarck-Mandan Securities, Inc. ("Bis-Man"). He has worked at Bis-Man on and off for the past ten years. When first hired, Markel was paid $6.50 an hour, and he currently earns $8.50 an

---

[2] When Markel first began at MJM it was known as BLH Ground Maintenance but the name changed shortly after his arrival.

3

hour. In 2005 Markel worked for Bis-Man from the beginning of January until February 28, 2005, and earned $2,163.00. He then left Bis-Man to begin working for MJM. He returned to Bis-Man two weeks before the trial in this matter and had not yet received a paycheck. Although he does not carry a weapon at this job, Markel testified that he believes he would be able to pass a state licensing test which would allow him to carry a weapon. Markel has no major criminal convictions that would be a basis for denying him a permit.

In the past few years, several businesses have entered the Bismarck marketplace, including Lowe's, Home Depot and Best Buy. Markel testified that many of the jobs coming into the community pay between $10.00-$12.00 per hour. When asked what, if any, jobs he had applied for in the last eighteen to twenty-four months, Markel responded that he applied for only one job in the last six months: a gatekeeper at the Lowe's lumberyard. He did not, however, receive a job offer at that time.

Markel currently owes $14,923.46 on his student loans.[3] While he admits he is in default regarding this debt, Markel testified that after all of his reasonable expenses are paid for the month, he may have only $50.00 left over if nothing unexpected happens during the month. Prior to filing his petition for bankruptcy, Markel had not made any student loan payments for four or five years. Although he received deferments while in school, he has not sought any forbearances or deferments and has not initiated any discussions with any lender or the DOE since he began working full-time in 2000. In 2000, a lender contacted him and explained a few new options for the repayment of his loans, but without knowing what his disposable income

---

[3] $14, 923.46 represents the amount owed at the time the Complaint in this adversary proceeding was filed. Interest accrues daily.

4

would be on a month-to-month basis, Markel chose not to set up a repayment plan.

Delores Gorhem appeared for the DOE. Gorhem works in the San Francisco, California office of the DOE and is employed as a loan analyst. Part of her job is reviewing and analyzing individual student loan debts to determine repayment options. Gorhem testified that her office receives loans once they have been defaulted on because the DOE is the guarantor of student loans. Once received, the DOE sends out a notice of default to the debtor. In this case, the DOE received Markel's loans on November 10, 2004. Based upon her employment, Gorhem is familiar with Markel's payment history on his loans.

On the date of the trial, the exact amount owed by Markel to the DOE was $15,151.86. This amount includes the loan principal and accrued interest as of November 30, 2005. While the loan has been in the possession of the DOE, Markel has not made any voluntary payments on it. The only reduction in the loan principal resulted from two set offs from tax refunds seized by the Department of the Treasury. These set offs totaled $1,043.10.

Several repayment options are available to Markel. At trial, Gorhem outlined three-, five-, seven- and ten-year payment plans that would pay Markel's loans in full. In addition to these traditional repayment plans, Gorhem discussed two special options available to Markel. First, Markel could qualify for a "reasonable and affordable repayment plan." With this plan, Markel would be required to fill out a financial disclosure form to determine what is affordable for him to pay per month. At this time, the DOE would be willing to accept $50.00 per month for one year. After one year has elapsed, Markel would be required to file a new financial disclosure form and a new monthly amount would be determined. If this repayment option is not feasible, the DOE also has an "income contingent repayment plan." Under this plan, if Markel made six

5

consecutive monthly payments of $50.00, he would become eligible to obtain additional loans so he could finish school. If he qualified, Markel would be required to continue making the $50.00 payments while he was in school. Under either scenario, the DOE would not agree to $0 monthly payments.

## Conclusions of Law

Section 523(a)(8) of the Bankruptcy Code states:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution . . . unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

Under this section, the debtor seeking discharge has the burden of proving "undue hardship" by a preponderance of the evidence. See In re McCormick, 259 B.R. 907, 909 (B.A.P. 8th Cir. 2001).

While student loan debts will be discharged if they impose an undue hardship, the term "undue hardship" is not defined by the statute. The Eighth Circuit has stated that when analyzing the term "undue hardship," a court is required to examine the totality of the circumstances. See Reynolds v. Pennsylvania Education Assistance Agency (In re Reynolds), 425 F.3d 526, 531 (8th Cir. 2005). In examining the totality of the circumstances, courts should consider: 1) the debtor's past, present and reasonably reliable future financial resources; 2) a calculation of the debtor's reasonable living expenses; and 3) any other relevant facts and circumstances of the particular case before the court. Id. at 532.

In analyzing Debtor's financial resources, the Court has taken the testimony of Markel as true. Shortly after leaving school he obtained employment paying him minimum wage. Since

6

that time, Markel worked for Dunbar Security making $7.50 and hour and currently has two jobs during the year that pay him $8.50 an hour (Bis-Man) and $10.00 an hour (MJM). While Markel will earn approximately $17,000[4] in 2005, he has shown an ability to increase his earnings as his experience has increased. Markel also testified that the Bismarck area is experiencing an influx of businesses and that these businesses are paying $10.00-$12.00 per hour ($20,800 to $24,960 per year). Although he has not obtained a higher paying job to date, he has only applied for one new job in the last six months. Based upon his previous security experience, his ability to obtain multiple licenses in the State of North Dakota, and his computer skills, it is the Court's determination that Markel has not yet maximized his earning potential. See In re Randall, 255 B.R. 570, 577 (Bankr. D.N.D. 2000) (holding that a debtor has a duty to maximize income and minimize expenses). At 33 years old, Markel has demonstrated an ability to find employment commensurate with his abilities, maintain that employment and increase his pay. Coupled with the fact that if he so desires Markel could finish a bachelor's degree in Business Administration in one to one-and-a-half years, the Court is convinced that Debtor's future financial outlook is bright.

Next, in analyzing the totality of the circumstances courts must consider the debtor's reasonable living expenses. See Reynolds, 425 F.3d at 532. After reviewing Debtor's Schedule J, *Current Expenditures of Individual Debtor(s)*, it is clear to the Court that Markel is not living beyond his means. At the same time, however, many of Markel's expenses will not change

---

[4] The Court deduces this total from taking Markel's stated income at MJM for 2005 ($12,800.00) and adding $4,326.00, which represents his stated two month income from Bis-Man for January and February 2005 ($2,163.00) multiplied by two to include income for November and December 2005.

7

significantly over time. For instance, his rent, food, and insurance expenses will vary little over the next several years. Markel testified that currently, if nothing exceptional happens during the month, he has approximately $50.00 left over. Although the Court recognizes that emergencies do occur and the $50.00 excess is not a given, the majority of Markel's income-earning years are in front of him, his expenses are set for the most part, and the Court believes that Markel will have additional income in the near future.

Lastly, this Court must consider any additional relevant facts and circumstances surrounding this particular case. Id. When considering the third prong of the totality of the circumstances inquiry, this Court has previously considered the following factors: 1) total incapacity now and in the future to pay one's debt for reasons not within debtor's control; 2) whether debtor has made a good faith effort to negotiate a deferment or forbearance; 3) whether hardship will be long term; 4) whether the debtor has made payments on loans; 5) whether there is a permanent or long term disability of the debtor; 6) ability of the debtor to gain employment in the area of study; 7) good faith effort to maximize income and minimize expenses; 8) whether the dominant purpose of bankruptcy was to discharge student loans; and 9) the ratio of student loans to total indebtedness. See In re Randall, 255 B.R. 570, 577 (Bankr. D.N.D. 2000).

Markel is a healthy 33-year-old man with no dependents and no disabilities. He has faced no major life-altering events. Upon an examination of Markel's indebtedness, his student loan obligations make up approximately 50% of his total debt. Although he testified that he cannot make regular payments, Markel has made no payments on his student loans even during months when he had excess income. Gorhem testified that while the DOE has been in

8

possession of Markel's loans, no payments have been received nor has Markel contacted the DOE about deferments, forbearances or about setting up an alternative payment option. In short, Markel has made no effort whatsoever in the last five years to deal with his student loan debt.

   Requiring Markel to repay his student loan debt does not impose an undue hardship on him. An undue hardship is something more than mere unpleasantness in being required to repay student loans. Id. In the past this Court has associated an undue hardship with a total inability not only to repay student loans at the time of filing for bankruptcy, but also into the future. Id. Associated with this total inability to make payments into the future is a certainty of hopelessness in meeting future financial obligations. Id. Markel has not only shown a lack of such hopelessness, his current circumstances are much better than several others that have come before Courts seeking discharge of student loans, only to be denied. Id. (ruling that an attorney faced with chronic pain syndrome was not under an undue hardship despite marginal employment); In re Parker, 328 B.R. 548 (B.A.P. 8th Cir. 2005) (reversing the bankruptcy court and determining it was not an undue hardship for a single, 51-year-old art teacher with no dependents and a medical condition to repay her student loans); In re Svoboda, 264 B.R. 190 (B.A.P. 8th Cir. 2001) (holding it was not an undue hardship under the totality of the circumstances to require a teacher to repay student loans even though no support payments were being received from the ex-spouse).

   While Markel is currently in a difficult financial situation, there is no evidence that his situation is hopeless, nor is there evidence that his situation will continue indefinitely into the future. On the contrary, based upon his education, skills and experience, coupled with the addition of several new businesses in the Bismarck area, the prospect of Markel obtaining a

higher paying job in the near future is good. Requiring Markel to pay back his student loans does not impose an undue hardship.

The outstanding student loan debt of Shawn D. Markel in the amount of $14, 923.46 plus interest is nondischargeable.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY**

Dated this 16th Day of December, 2005

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**